UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

David Marsico,

      Plaintiff,

v.                                                        Case No. 06-10235

Sears Holding Corporation f/k/a Kmart          Honorable Sean F. Cox
Holding,

      Defendant.

_____/

## OPINION & ORDER
## GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff David Marsico ("Marsico" or "Plaintiff") filed this age discrimination suit

against his former employer, Sears Holding Corporation f/k/a Kmart Holding ("Defendant"), on

January 18, 2006.  This Court granted summary judgment in favor of Defendant in August, 2007.

Plaintiff appealed and the Sixth Circuit remanded so that Plaintiff could depose two additional

witnesses and use those depositions in responding to Defendant's motion.  Plaintiff has now

taken those two depositions and the matter is back before the Court on Defendant's Renewed

Motion to Dismiss and/or for Summary Judgment.  The parties have fully briefed the issues.

The Court finds that the issues have been adequately presented in the parties' briefs and that oral

argument would not significantly aid the decisional process.  *See* Local Rule 7.1(f)(2), U.S.

District Court, Eastern District of Michigan.  The Court therefore orders that the motion will be

decided upon the briefs.  As set forth below, Plaintiff has not submitted any evidence from the

two new depositions that changes the Court's conclusion that Defendant is entitled to summary

1

judgment.  The Court shall again grant summary judgment in favor of Defendant.

BACKGROUND

A.      Procedural Background:

Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on June 20, 2005.  (Ex. 17 to Pl.'s Response Br.).  Plaintiff's charge identified the "date of occurrence" as February 25, 2005.

Plaintiff filed this action against Defendant on January 18, 2006, alleging: "Violation of the ADEA - Disparate Treatment" (Count I); "Violation of the ADEA - Disparate Impact" (Count II); "Violation of the Elliott-Larsen Civil Rights Act - Disparate Treatment" (Count III); and "Violation of the Elliott-Larsen Civil Rights Act - Disparate Impact" (Count IV).

During discovery, Plaintiff sought to depose: 1) Edward Lampert; and 2) William Crowley.  Magistrate Judge Morgan denied Plaintiff's motion seeking to compel those depositions and this Court affirmed that ruling.

Following the close of discovery, Defendant filed a Motion to Dismiss or for Summary Judgment.  In responding to the motion, Plaintiff agreed to voluntarily withdraw Counts II and IV of his complaint, leaving only Plaintiff's claims of disparate treatment under the ADEA (Count I) and the ELCRA (Count II).  (Docket Entry No. 50 at 1 n.1).

In an Opinion & Order issued on August 30, 2007, this Court granted Defendant's Motion for Summary Judgment.

Plaintiff appealed.  The majority[1] of the Sixth Circuit Panel that heard the case reversed and remanded, concluding that Plaintiff should have been allowed to depose Edward Lampert

---

[1]Judge Raymond Kethledge dissented, indicating that he would affirm.

2

and William Crowley during discovery and "should have been allowed to utilize the evidence

obtained from these depositions in responding to Defendant's motion for summary judgment."

*Marsico v. Sears Holding Co.*, Case No. 07-2231 at * 13 (6th Cir. March 25, 2010).

Following remand, this Court held a status conference on July 6, 2010, at which time it

issued a new Scheduling Order, so that Plaintiff could depose Lampert and Crowley. (Docket

Entry No. 72).

On November 1, 2010, Defendant filed its Renewed Motion to Dismiss and/Or For

Summary Judgment.

B.    Factual Background:

This Court's practice guidelines for motions for summary judgment provide, in pertinent

part, that:

> a. The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute. The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record . . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-
> Statement of Disputed Facts. The counter-statement shall list in separately
> numbered paragraphs following the order or the movant's statement, whether each
> of the facts asserted by the moving party is admitted or denied and shall also be
> supported by appropriate citations to the record. The Counter-Statement shall also
> include, in a separate section, a list of each issue of material fact as to which it is
> contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute
> shall be deemed admitted unless controverted in the Counter-Statement of
> Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary

judgment such that: 1) along with Defendant's Renewed Motion to Dismiss and/or for Summary

3

Judgment, Defendant filed an "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.") and 2) along with Plaintiff's Response, Plaintiff filed his "Counter Statement of Disputed Facts" (Pl.'s Stmt.").

The following material facts are gleaned from the parties' statements and the evidence submitted by the parties.

Plaintiff worked for Defendant for more than 33 years.  In May 2002, Plaintiff (date of birth 8/8/49) was "Division President, Eastern Division" for Kmart Corporation ("Kmart") with responsibility for the eastern part of the United States.  (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1). Plaintiff was promoted to that position by Julian Day (date of birth 5/14/52) ("Day"), who had been appointed to serve as Kmart's President and CEO in March 2002.  (Def.'s Stmt. at ¶ 2; Pl.'s Stmt. at ¶ 2).

Kmart was in bankruptcy at the time that the Kmart Board hired Day.  (Day's Dep. at 6-8).  Kmart came out of bankruptcy in May 2003.  (*Id.*).  After Kmart emerged from bankruptcy, Day became the CEO and reported to the Board of Directors.  Eddie Lampert ("Lampert") was the new Chairman of the Board of Directors after Kmart emerged from bankruptcy.  (*Id.* at 15).

Plaintiff was moved[2] from the "Division President, Eastern Division" position to "Senior Vice President of Store Operations" on February 1, 2003.  (Def.'s Stmt. at ¶ 3; Pl.'s Stmt. at ¶ 3). Plaintiff earned an annual salary of $385,000 in that position and continued to report to Day in that position.  Plaintiff remained Senior Vice President of Store Operations for approximately ten months.  (Def.'s Stmt. at ¶¶ 4-6; Pl.'s Stmt. at ¶¶ 4-6).

---

[2]Defendant contends that move was a promotion, while Plaintiff contends it was a lateral move to due to reorganization which eliminated the Division President position.

4

Plaintiff testified that while he was in store operations, sometime during 2003, Lampert came to talk to him and commented that Plaintiff "had been around a long time."  (Pl.'s Stmt. Of Material Facts in Dispute at ¶ 18; Pl.'s Dep. at 5).

Rod Brumley ("Brumley"), a former employee of Defendant, was deposed in this action and testified that in May 2003, Lampert asked him to inquire about a refund policy sign at one of Plaintiff's stores.  Brumley states that when he advised Lampert that he had "received the answer from store ops," and advised him of the answer, Lampert said "that's what's wrong with these K-Mart people, that old way of thinking."  (Brumley Dep. at 62).  No evidence has been submitted to the Court to establish that Plaintiff was aware of that comment prior to this litigation.

Plaintiff remained in the position of Senior Vice President of Store Operations until September 2003.  Thus, he was in that position for less than 10 months of his more than 33-year tenure at Defendant.  Day made the decision to move Plaintiff out of that position.  (Pl.'s Dep. at 158).   Defendant contends that Day removed Plaintiff from the position of Senior Vice President of Store Operations for performance reasons, specifically because the "allocation of store staffing hours" and the financial performance of "ancillary elements" in the stores (*e.g.*, kiosks) had not improved under Plaintiff's management.  (*See* Day Dep. at 30).

Plaintiff testified, however, that Day told him he "wanted to make a change, that Super K was losing money, and wanted me to go over and change the results."  (Pl.'s Dep. at 39-40). Plaintiff believed it would be a temporary move, although he testified that Day did not tell him it would be a temporary move.  (*Id*. at 42).

In any event, it is undisputed that Day made the change and that Plaintiff assumed the position of "Vice President of Super K and Carribean" on October 1, 2003, at a salary of

5

$385,000. (Def.'s Stmt. at ¶ 12; Pl.'s Stmt. at ¶ 12; Ex. 11 to Pl.'s Br.). Neither Lampert nor Crowley were involved in the decision to place Plaintiff in that position. (*Id.*).

Plaintiff testified that although he initially continued reporting to Day, he later began to report to Dene Rogers ("Rogers"). (Pl.'s Dep. at 46-48). Although Plaintiff's title was initially "Vice President, Super Kmart Centers and the Carribean," the Carribean stores were later removed from his area of responsibility and assigned to another employee who was the same age as Plaintiff. Plaintiff's title then changed to "Regional Vice President, Super Kmart Stores." (Def.'s Stmt. at ¶¶ 14-15; Pl.'s Stmt. at ¶¶ 14-15).

In April of 2004, Day notified Plaintiff that his pay as a regional vice president would be reduced to $250,000. Plaintiff testified that Day told him that he needed to reduce Plaintiff's pay so that he would be more in line with other regional vice presidents. (Pl.'s Stmt. of Material Facts in Dispute at ¶ 8; Pl.'s Dep. at 76). Plaintiff negotiated with Day as to his salary and it was ultimately agreed that Plaintiff would earn a salary of $275,000 effective July 2004. Plaintiff admits that negotiated salary was still substantially more than the $190,000-$200,000 annual salaries that other regional vice presidents were paid by Defendant at that time. (Def.'s Stmt. at ¶¶ 18-20; Pl.'s Stmt. at ¶¶ 18-20). Lampert testified that he did not discuss lowering Plaintiff's salary with Day at any time. (Lampert Dep. at 22).

In approximately June 2004, Plaintiff began reporting to Rogers (Def.'s Stmt. at ¶ 22; Pl.'s Stmt. at ¶ 22), who began working for Defendant in October 2003. Rogers holds an M.B.A. from Yale University and had previously worked for GE Capital Corporation (in the area of business development), Penske Automotive, and then for Starwood Hotels, where he reported to that company's chairman. (Def.'s Stmt. at ¶ 25; Pl.'s Stmt. at ¶ 25). Rogers reported to Day.

6

(PSMF at ¶ 21).

Defendant contends that it hired Rogers as a consultant for an initial three-month term and that Day hired Rogers to analyze problems and produce financial solutions for Defendant. (Rogers Dep. at 8 & 31; Day Dep. at 21).

Plaintiff contends that Rogers was hired as an employee with the title of Consultant to handle store operations and that he worked in store operations from "day one." (*See* Pl.'s Stmt. of Material Facts in Dispute at ¶¶ 27-28; Pl.'s Ex. 13, excerpt of Annual Report stating that Rogers "joined the Company in October 2003 as the head of Store Operations"; Rogers Dep. at 34-35).

In any event, the parties agree that in February 2004, Rogers's employment was extended and he formally became "Head of Store Operations" and in May 2004 he became "Senior Vice President Store Operations" reporting to Mr. Robert Norton ("Norton") (d.o.b. 12/30/46), who was "Senior Vice President Kmart Stores." (Def.'s Stmt. at ¶ 29; Pl.'s Stmt. at ¶ 29).

As Senior Vice President Store Operations, Rogers was responsible for "headquarters functions" which supported the stores. Norton had overall responsibility for "store operations" as well as the Kmart stores themselves. (Def.'s Stmt. at ¶¶ 31-32; Pl.'s Stmt. at ¶¶ 31-32).

In June 2004, however, Norton left the company and Rogers succeeded him as Senior Vice President Kmart Stores. (Def.'s Stmt. at ¶ 33-34; Pl.'s Stmt. at ¶ 33-34). That is when Plaintiff began reporting to Rogers. Plaintiff testified that he "liked" Rogers and that the two of them got along "okay." (Def.'s Stmt. at ¶ 35; Pl.'s Stmt. at ¶ 35). Plaintiff admits that Rogers

never criticized his performance and that as far as he knew,[3] Rogers thought he was doing a good job. (*Id.* at ¶ 36).

Plaintiff testified that in October 2004, he heard about Roger's idea to transition the Kmart Super Centers into the regions. (Pl.'s Dep. at 85-86). Such a move would have transitioned responsibility for the Kmart Super Centers to the regional vice presidents so that those individuals would have responsibility over the regular Kmart stores in their regions plus the Kmart Super Centers in their region. (*Id*. at 84). Plaintiff testified he did not know what his job responsibility would be if the change took place, but that he thought he would be placed in another job and he and Rogers talked about a potential job for Plaintiff at Sears. (*Id*. at 85). The integration, however, never took place. (*Id*. at 91).

Day testified that he left Defendant in October of 2004. (Day Dep. at 6). Alynn Lewis ("Lewis") then replaced Day as President and CEO.

Plaintiff testified that in November 2004, he and Day had a conversation over dinner. (Pl.'s Dep. at 79). Plaintiff testified that during that dinner, Day raised the subject of Rogers being placed in the position of Senior Vice President of Store Operations. (Pl.'s Dep. at 80). Plaintiff described the conversation as follows during his deposition:

> A.  Well, he said that, you know, 'He's taken over that position and I know that that might be hard for you to take,' and we talked and had a meeting and he said, 'If you really want to think about leaving, I can help you try to find something different.  I owe you.  You've done a great job for me.'
>
> . . . .

---

[3]Rogers testified that somewhere between August and October, he discussed the suitability of Plaintiff as a vice president in charge of Super Ks with senior management. (Rogers Dep. at 78-79). There is no evidence before the Court to establish that Plaintiff was aware of those conversations prior to this litigation.

8

> Q.    What did he say?
>
> A.    Just said that, "Dene's going to stay in that position and, you know, if you – I think you may have a hard time working with him, and if you really want to look somewhere else, I can try to help you. I owe you. You've done a great job for me. I'm going to see what I can do.'
>
> Q.    And what did you say in response to his statements?
>
> A.    I said I was disappointed, because I thought I could go back and, you know, run the store operations.
>
> Q.    And what did he say?
>
> A.    He reiterated again to me that Eddie [Lampert] doesn't think that someone's that's been around for 30 years can fix Kmart.[4]

(Pl.'s Dep. at 79-80). Plaintiff testified that he believes Day raised these topics. (Pl.'s Dep. at 80).

Day, on the other hand, testified that he believes that Plaintiff initiated the conversation at issue. (Day Dep. at 45-46). Day testified that Plaintiff told him "[t]hat he was getting pressure from Dean Rogers on his performance and, you know, was thinking maybe he should leave the company." (*Id.*). When asked if he recalled volunteering to help Plaintiff find another job, Day testified, "I think I – you know, I liked Dave personally and so to the extent it – to the extent he expressed uncertainty whether he should stick around or not, I probably expressed a willingness to help him if he wanted to do something different." (Day Dep. at 51).

Plaintiff testified that in November 2004, Rogers told him that he should think about finding another job. (Pl.'s Dep. at 113). Specifically, Plaintiff testified as follows about that

---

[4]Plaintiff's complaint and EEOC Charge both allege that Day said that "Eddie Lampert believes that someone who has been here for 30 years can't fix Kmart or they would have done so." (Compl. at ¶ 24; Ex. 17 to Pl.'s Br.). Plaintiff testified that his statements in his EEOC were accurate. (Pl.'s Dep. at 162-63). Day denies making this statement. (Day Dep. at 47-48).

conversation:

> Q.   Tell me the entire conversation that you can recall where this statement
>      was made to you by Dene Rogers that you should think about leaving.
>
> A.   We were discussing the integration and he was talking about moving into
>      Kmart, and I said, 'Well, once we do that, eventually what will I do?' And
>      he says, "Well, I've talked to Alynn about you going over into the Sears
>      position,' and I said, 'Okay.' And we talked a little more, and he was a bit
>      distracted because he was typing at the time he was talking to me on the
>      computer, and I said, 'You know, I really have been around for 30 years. I
>      can really be a benefit to the company.' And I don't think he heard what I
>      said, but he said to me, 'Maybe you should look for another job.' And I
>      said, 'Yeah, but I've been around 30 years. I've given everything to this
>      company. I've worked long hours, given up vacations, everything, and I
>      just want to be treated fairly.' He said, "You know what, Dave? Nobody
>      really cares about you anyway.' And that's how it kind of ended. There
>      was a dinner that night, but I didn't go. I was, you know, verbally, you
>      know, I was kind of upset.

(Pl.'s Dep. at 114-116). Plaintiff also testified that at or around this time, Rogers told him that

"Bill Crowley, who was with ESL, wanted [Plaintiff] gone." (Pl.'s Dep. at 175).

Plaintiff testified that at the end of November 2004, he learned that Rogers had changed

his position as to the proposed integration. (Pl.'s Dep. at 91-92). Plaintiff learned that Lewis, the

new President and CEO did not want any changes to be made. (*Id*.).

Rogers testified that Lewis indicated that he wanted to evaluate and form his own opinion

about the leaders of the company. (Rogers Dep. at 80-81). He states that Lewis specifically said

that no "people changes" would be made without his permission and "he would make up his own

mind about the more senior leaders of the company." (*Id*)

Plaintiff testified that he first inquired about obtaining a job at Meijer, Inc. ("Meijer"),

and that he interviewed with Meijer, in November 2004. (Pl.'s Dep. at 16-18). He also testified

that he started looking at leaving Defendant's employ in November 2004 because there were a lot

of changes at the company.  (Pl.'s Dep. at 28-29).

Plaintiff testified that he verbally accepted a position with Meijer in January, 2005. (Pl.'s Dep. at 106-08).

Plaintiff submitted a resignation letter to Defendant on February 16, 2005.  (Ex. G to Def.'s Br.).

Plaintiff testified that he talked to David Whipple, a vice president in Defendant's human resources department, after submitting his letter of resignation.  (Pl.'s Dep. at 148).  Whipple asked Plaintiff if he wanted time to think about his decision and Plaintiff responded that he had made up his mind to resign.

Plaintiff also testified that he had another conversation with Whipple a few weeks prior to his resignation, when Plaintiff talked to him to see where he might fit in the future if the integration took place.  (*Id.* at 149-150).  Plaintiff states that he told Whipple that Rogers had told him that he had talked to Lewis about Plaintiff possibly taking over Sears stores.  He states that Whipple responded, "What is he talking about?" and stated that Plaintiff was not being considered for a position at Sears.  (*Id.* at 151-153).  Plaintiff admits, however, that he never asked Lewis about moving over to Sears after the merger or expressing interest in any other opportunities with Defendant.  (Pl.'s Dep. at 151).

Rogers testified that at the time Plaintiff had announced his resignation, he did not intend to terminate him.  (Rogers Dep. at 79).  He further testified that if Plaintiff had not resigned, he would have transferred over to Sears Holdings after the merger, at least initially, and that there would have been no changes and he would have been a Sears Holding employee.  (Rogers Dep. at 84).

11

ANALYSIS

Plaintiff alleges that, in violation of the ADEA and the ELCRA, due to his age, Defendant: 1) demoted him and replaced him with a younger employee when he was removed from his position as Senior Vice President of Store Operations; and 2) constructively discharged him on or about February 25, 2005.

I.    Plaintiff's ADEA Claim Based Upon His Demotion Shall Be Dismissed For Failure To File A Timely EEOC Charge.

In its Renewed Motion, Defendant against asserts that Plaintiff's claim based upon his demotion under the ADEA should be dismissed for failure to file a timely EEOC charge.  (Def.'s Br. at 10-11).

In response to this argument, Plaintiff notes that this argument applies only to his ADEA claim and not his ELCRA claim.  Plaintiff then argues, as he did in his response to Defendant's initial motion, that "[a]lthough the actual demotion occurred outside [the applicable] time-frame it is still actionable as part of the constructive discharge claim."  (Pl.'s Br. at 8).

The Court has already addressed this argument in its August 30, 2007 Opinion & Order and the discovery obtained from Lampert and Crowley does not relate to this issue.  Thus, the Court continues to conclude that Plaintiff's ADEA claim based upon his demotion is time-barred and the Court declines to apply the continuing violations theory to save Plaintiff's otherwise time-barred ADEA claim based upon his demotion.  Defendant is therefore entitled to summary judgment with respect to Plaintiff's ADEA claim that is based upon the demotion.   His demotion, however, can still be considered as an adverse action for purposes of his claims under the ELCRA.  Thus, the Court must still analyze Defendant's arguments for summary judgment as to each claim.

II.     Plaintiff's Remaining Claims Under The ADEA And The ELCRA:

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on his discrimination claim.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Here, even with the benefit of Lampert and Crowley's deposition testimony, Plaintiff does not contend that any direct evidence supports his age discrimination claims.  He must therefore rely on circumstantial evidence.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Both parties acknowledge that the *McDonnell Douglas* framework is applied to Plaintiffs ELCRA and ADEA claims and that Plaintiff bears the burden of establishing a prima facie case. They also agree that in order establish a prima facie case of age discrimination, Plaintiff must establish that: 1) he is a member of the protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position he held, and 4) he was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably.

Plaintiff asserts that two adverse actions support his prima facie case:  1) his demotion from his position as Senior Vice President of Store Operations; and 2) his "constructive discharge" on February 25, 2005.  Each will be addressed in turn.

A.     Defendant Is Entitled To Summary Judgment On Plaintiff's Claim That He Was Demoted From Store Operations Based On His Age In Violation Of The ELCRA.

Defendant does not appear to dispute that Plaintiff has established a prima facie case of age discrimination with respect to this claim.  Rather, Defendant contends that this claim fails at

13

the pretext stage.

Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the Plaintiff's discharge.

Here, Defendant states that Day removed Plaintiff from the Senior Vice President of Store Operations position in September 2003 because of Plaintiff's poor performance in that position. Day testified that he moved Plaintiff out of the position of Senior Vice President of Store Operations because he was dissatisfied with Plaintiff's performance in that position in two respects. (Day Dep. at 29-31). Day testified that Plaintiff failed in his responsibilities in that position in that: 1) "allocation of store staffing hours did not get better under his management of that area;" and 2) "certain ancillary elements of what were in stores – that also did not improve, their financial performance, things like kiosks." (*Id.*).

If a defendant articulates a nondiscriminatory reason for the challenged action, the plaintiff bears the ultimate burden to prove by a preponderance of the evidence that the proffered explanation was a pretext for discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Moreover, where more than one such reason is proffered, it is Plaintiff's burden "to show that *each* proffered reason is merely a pretext for illegal discrimination. *Kestner v. Stanton Group, Inc.*, 202 Fed.Appx. 56 at *4 (6th Cir. 2006) (emphasis added); *see also Myers v. U.S. Cellular Corp.*, 257 Fed.App. 947, 952 (6th Cir. 2007); *Bhama v. Mercy Memorial Hosp. Corp.*, 2011 WL 1086632 at * 7 (6th Cir. March. 25, 2011).

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are

14

a pretext for unlawful discrimination.  *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason:  1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct.  *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer*, 29 F.3d at 1084.  The first type of showing consists of evidence that the proffered bases for the termination never happened *(i.e.*, that they are factually false).  With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Id*.  The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct.  *Id.*

Here, Plaintiff seeks to establish pretext by each of the above methods.  This Court still concludes, however, that Plaintiff has not come forth with sufficient evidence of pretext to survive summary judgment.

1.     No Basis In Fact:

Again, the first type of showing consists of evidence that the proffered bases for the termination never happened *(i.e.*, that they are factually false).

Day gave two specific examples of how he believed Plaintiff had failed in his responsibilities in the position of Senior Vice President of Store Operations:  1) "allocation of store staffing hours did not get better under his management of that area;" and 2) "certain ancillary elements of what were in stores – that also did not improve, their financial performance, things like kiosks."  (*Id*.).

a.      No Written Documentation:

In response, Plaintiff states that Defendant has no support for its position other than Day's testimony.  He stresses that Day did not put his concerns about Plaintiff in writing and claims that he was not given an explanation when he was demoted.

In response to Defendant's Renewed Motion, Plaintiff submitted the same affidavit he submitted in response to Defendant's original Motion for Summary Judgment.  In that affidavit (Pl.'s Ex. 12), Plaintiff states that he recalls two evaluations from Day, both of which were "very positive."  He does not state, however, the date of such evaluations or whether they took place while Plaintiff was in the position in question.  That is significant because it is undisputed that Plaintiff also reported to Day while Plaintiff was the "Division President, Eastern Division" for Kmart Corporation with responsibility for the eastern part of the United States. [5]

Plaintiff did not submit any written evaluations, either positive or negative, from Day. The fact that Day did not give Plaintiff a written evaluation during the less than 10 months he was in the position at issue does not establish that his stated reasons are without a basis in fact.

b.      Store Hours:

Again, Day testified that one of the reasons he moved Plaintiff out of his position as Senior Vice President of Store Operations position in September 2003 was that allocation of store staffing hours did not get better under this management of that area.

With respect to allocation of store hours, Plaintiff's affidavit states, "data provided to me by the company in discovery proves that Day's complaints are false."  (Ex. 12 to Pl.'s Compl.). Plaintiff's affidavit then states:

---

[5]This Court highlighted this deficiency in its August 30, 2007 Opinion & Order at 18.

16

> 8.      In September of 2003, company records show that stores were budgeted at
> $1.531 billion for staffing costs fiscal year to date.(Feb 1 to Jan 31)
> According to these same records, the actual allocation of staffing costs was
> $1.504 billion or [sic] this same period of time.  For the months of August,
> July, June, May, April and February, we were again below budget for
> allocation of staffing costs.

(Marsico Affidavit at ¶ 8).

In response to Defendant's original Motion for Summary Judgment, Plaintiff did not

submit any of the unspecified data or company records to the Court.  Plaintiff has now submitted

Exhibit 21, which he contends show that "[a]s to staffing hours, the review of the records

demonstrates that Plaintiff was below budget each month. (Exh 12)."  (Pl.'s Br. at 18).

Plaintiff did not submit Exhibit 21 until March 2, 2011, after all briefing had concluded.

Because Plaintiff did not submit Exhibit 21 until after briefing had concluded, the Court allowed

Defendant to file a very short response addressing the untimely exhibit.

Defendant contends the exhibit does not establish pretext for several reasons.  First,

Defendant contends that Exhibit 21 is meaningless because Defendant has provided no context

for the exhibit.  Second, Defendant contends that "Exhibit 21 does not show an improvement in

allocation of store hours.  Third, Defendant contends that Exhibit 21 does not support Plaintiff's

affidavit:

> The documents comprising Exhibit 21 do not indicate the time period they cover,
> but instead merely contain a heading, for example, "As of PD11-Dec-2002."[6] Nor
> do the documents indicate what the budget was for staffing costs, or what the
> actual allocation costs were.

_____

[6]The Profit and Loss Statements that Plaintiff filed as Exhibit 21 contain handwritten
dates in the margins.  The Profit and Loss Statements that Defendant produced to Plaintiff during
discovery did not include these handwritten dates. Plaintiff does not give any explanation as to
who wrote the dates or how the dates were calculated.

(Def.'s Suppl. Br. at 2).

The Court continues to conclude that Plaintiff has not presented sufficient evidence from which the jury could reasonably reject Defendant's stated reason as having no basis in fact. Plaintiff has provided no context to the Court to explain what Exhibit 21 purportedly shows. That exhibit consists of 3 pages, two of which appear to be statements that relate to "Super Kmart Stores," rather than all stores. The third page states appears to indicate it is a profit and loss statement for January 2004. Thus, these documents do not support Plaintiff's assertion that Defendant's stated reason for removing him from the Senior Vice President of Store Operations position in 2003 was without a basis in fact.

c.    Ancillary Elements Such As Kiosks:

Again, where more than one such reason is proffered, it is Plaintiff's burden "to show that *each* proffered reason is merely a pretext for illegal discrimination. *Kestner, supra; Stanton Group, Inc.*, *supra*.

With respect to Day's concerns regarding ancillary elements such as kiosks, Plaintiff's affidavit states as follows: "With respect to my alleged performance on 'ancillary elements' as alleged by Julian Day in his deposition, I have no knowledge of what he is referring to. I was never informed that I was deficient in performing on store kiosks or an any 'ancillary elements'." (*Id.*).

If Plaintiff or his counsel were unsure as to what Day was referring to, they could have questioned Day further regarding this stated reason during his deposition or submitted written discovery requests regarding this stated reason. In addition, Plaintiff could have requested

18

discovery on this stated reason when the case was remanded.[7]  It is not sufficient for a plaintiff to

simply state "I don't know what you are referring to."

Thus, because Plaintiff has not submitted any evidence to establish that this stated reason

for removing Plaintiff from his position as Senior Vice President of Store Operations is without a

basis in fact, a jury could not reasonably reject this stated reason for Plaintiff's removal.  *Bhama,*

*supra*, at *7.

### 2.      Did Not Actually Motivate:

With respect to the second kind of showing, "the plaintiff argues that the sheer weight of

the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's

explanation is a pretext, or coverup."  *Id.*

Plaintiff contends that "Defendant's upper management, particularly Lampert, had a bias

against older employees."  (Pl.'s Br. at 19).  Plaintiff relies on three statements allegedly made by

Lampert:  1) telling Plaintiff in 2003 that Plaintiff had been around a long time; 2) stating to

Brumley in May 2003, "that's what's wrong with these K-Mart people, that old way of thinking,"

in relation to an issue that came up at a store; and 3) Day telling Plaintiff, in November 2004, that

Lampert did not "think that someone's that's been around for 30 years can fix Kmart."  (Pl.'s

Dep. at 80).

The Court continues to conclude that the alleged statements by Lampert are insufficient to

create a genuine issue of material fact as to pretext.

In age discrimination cases, generally courts examine statements allegedly showing

employer bias by considering whether the comments were made by a decision maker; whether

---

[7]This Court highlighted this deficiency in its August 30, 2007 Opinion & Order at 18-19.

they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination. *Krohn v. Sedgwick James, Inc.,* 244 Mich.App. 289, 298 (2001). It is undisputed that Lampert was not a decision-maker with respect to Plaintiff's removal from the position of Senior Vice President of Store Operations, the comments were not related to the decision-making process, and they were not proximate in time to the demotion.

Moreover, in addition to being isolated remarks from a non-decision-maker, the two comments are vague and ambiguous. Lampert's alleged comments about Plaintiff's longevity with Kmart or his years of service, without more, are insufficient to create an issue of fact as to pretext because "an employee's age is analytically distinct from his years of service." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993).

3.    <u>Insufficient To Warrant Termination:</u>

The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Manzer,* 29 F.3d at 1084.

Plaintiff asserts that other regional vice presidents were performing poorly but did not have their jobs eliminated:

> Plaintiff presented the testimony of Rod Brumley, another regional vice president, who was also privy to the Defendant's profit and loss statements. Brumley confirmed that the Super Kmart stores were doing well financially while two other regional vice presidents, Mark Hicks and Mike Pugh, whose regions were performing poorly were simply counseled by Rogers but did not have their jobs eliminated. (Brumley 74-5).

(Pl.'s Br. at 18).

Plaintiff cannot create an issue of fact as to pretext based on Brumley's testimony. First,

20

Brumley's deposition testimony does not support Plaintiff's assertion that despite performing poorly Hicks and Pugh kept their jobs and were "simply counseled by Rogers."   Rather, Brumley's deposition indicates that in addition to be being talked to about their poor numbers by Rogers, Hicks was *replaced* and Pugh's *position was eliminated*.  (*See* Brumley Dep. at 76).

Moreover, Plaintiff complains of being removed from his position as Senior Vice President of Store Operations and neither Hicks nor Pugh were in that position.  Rather, they were regional vice presidents.  Thus, their poor performance in an entirely different position cannot be deemed similar conduct. There is also no indication that Hicks or Pugh were not in the protected class.

Accordingly, the Court shall grant summary judgment in favor of Defendant with respect to Plaintiff's ELCRA age discrimination claim based upon the demotion because the evidence submitted by Plaintiff does not establish a genuine issue of material fact as to whether Defendant's legitimate, nondiscriminatory reason for the demotion was a pretext for unlawful age discrimination.

B.    Defendant Is Entitled To Summary Judgment On Plaintiff's Claim That He Was Constructively Discharged Based On His Age.

The parties agree that, for purposes of establishing a prima facie case, a plaintiff who resigns may nevertheless establish an adverse employment action by demonstrating that he was "constructively discharged."  Here, in addition to asserting that his demotion constitutes an adverse action for purposes of establishing a prima facie case of discrimination, Plaintiff also asserts that he was constructively discharged from his employment with Defendant on February 25, 2005.

"In the typical discriminatory constructive discharge case, the employer does not overtly

seek a discontinuation in the employment relationship but the employee claims to be subjected to intolerable working conditions *due to discriminatory behavior*." *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1127 (6th Cir. 1998) (emphasis). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Kuka v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "In the case of constructive discharge, 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). In determining whether an environment is one that a reasonable person would find hostile or abusive, courts look at all of the circumstances, which include: the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Id.*

In this Court's August 30, 2007 Opinion & Order, this Court concluded that Plaintiff had not submitted sufficient evidence to establish a constructive discharge.

In response to Defendant's renewed motion, Plaintiff has not submitted any deposition testimony either from Lampert or Crowley that changes this Court's conclusion that Plaintiff cannot establish a constructive discharge. The Court continues to conclude that, even when all evidence presented is viewed in a light most favorable to Plaintiff, under the facts of this case, a reasonable jury could not conclude that Defendant exposed Plaintiff to a work environment so hostile and abusive as to compel a reasonable person in Plaintiff's shoes to quit due to unlawful discrimination. *Goldmeier*, 337 F. 3d at 635.

There are two main components of Plaintiff's position that he was constructively discharged: 1) his demotion; and 2) the threat of his job being eliminated post-merger.

The central component of Plaintiff's alleged constructive discharge is his removal from the position of Senior Vice President of Store Operations.  A demotion within a company, however, "does not amount to a constructive discharge unless the proffered employment options would have been 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987)).

Under the facts presented here, there is insufficient evidence for a reasonable jury to conclude that a reasonable person in Plaintiff's shoes would have felt compelled to resign when he was removed from the Senior Vice President of Store Operations position in 2003.  While Plaintiff was demoted, that was the highest position Plaintiff had ever attained at the company and he only served in that position for less than 10 months of his 33.5 years of employment with Defendant.  Moreover, even after the demotion Plaintiff was still a high-level executive with significant job responsibilities.  Thus, his position could hardly be viewed as menial. Furthermore, Plaintiff's salary of $275,000 that he was paid after the demotion was a *higher* salary than other executives at his same level.

Plaintiff also asserts that he was constructively discharged because "there were threats that Plaintiff's position would be eliminated post-merger and he was not being considered for a job in the new organization."  (Pl.'s Br. at 12).

Plaintiff knew that Rogers contemplated transitioning responsibility for Kmart Super Centers to the regions such that Plaintiff's job could potentially be changed or eliminated.

23

Plaintiff testified that he did not know what his job responsibility would be if the change took place, but that he thought he would be placed in another job and he and Rogers talked about a potential job for Plaintiff at Sears. (*Id*. at 85).

In late November 2004, Plaintiff learned that Rogers had changed his position as to the proposed integration because Lewis, the new President and CEO, did not want any changes made. (Pl.'s Dep. at 91-92). It is undisputed that the integration never took place. (*Id*. at 91)

An employee's uncertainty regarding the effect of a merger on his job "does not translate into a constructive discharge." *Adams v. Lucent Tech., Inc*., 284 Fed.App. 296 at 302 (6th Cir. 2008). "An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obligated 'not to assume the worst, and not jump to conclusions too fast.'" *Agnew v. BASF Corporation*, 286 F.3d 307, (6th Cir. 2002).

Accordingly, the Court concludes that, under the facts of this case, Plaintiff has failed to presented sufficient evidence to allow a reasonable jury to conclude that Defendant exposed Plaintiff to a work environment so hostile and abusive as to compel a reasonable person in Plaintiff's shoes to quit due to unlawful discrimination.[8] *Goldmeier*, 337 F. 3d at 635.

--------

[8]In addition, the evidence submitted by Plaintiff would not allow a reasonable jury to conclude that someone in Plaintiff's shoes would have felt "compelled to resign *because of his age*." *Peters v. Lincoln Electric Company*, 285 F.3d 456, 479 (6th Cir. 2002)(emphasis added). It is well established that employment discrimination laws do not create a "general civility code" in the workplace. Courts are called upon to distinguish between lawful conduct, even if unkind or insensitive, and unlawful discriminatory conduct. *Vitt. v. City of Cincinnati*, 97 Fed. Appx. 634, 638 (6th Cir. 2004). Much of the evidence that Plaintiff relies on to support his constructive discharge claim has no objective indicia of age-based animus. An employee is not guaranteed a working environment that is free from stress. *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994). That is especially true here, where the events at issue transpired in a financially troubled company that had just emerged from bankruptcy and was undergoing significant changes and reorganization in order to survive.

24

In addition, assuming *arguendo* that Plaintiff could establish a prima facie case of age discrimination via the adverse action of a constructive discharge, Plaintiff would still have to submit sufficient evidence from which a reasonable jury could conclude that Defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful age discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

Plaintiff's alleged constructive discharge consists of both his demotion and the threat of his job being eliminated post-merger. The primary component according to Plaintiff, however, is Plaintiff's demotion. As explained above, Plaintiff has not submitted sufficient evidence to create a genuine issue of material fact as to whether Defendant's stated reasons for the demotion are a pretext for unlawful age discrimination. As to the proposed integration, Defendant's position is that Rogers considered the integration for business reasons and Plaintiff does not contest that. Thus, even if he could establish a constructive discharge, Plaintiff has not presented sufficient evidence to create a genuine issue of fact as to pretext.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Renewed Motion for Summary Judgment is GRANTED and Plaintiff's claims are DISMISSED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: April 4, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 4, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

25